Avery, J.
When this case came before the supreme court in the county, objection was made to proceeding, at least at that term, to a hearing in the case, for the reason that the citation was not served upon the commissioners till the 6th of June, not ten days before the term. It was issued upon the 4th of June, which was ten days before the term, and on the same day, as appears by the papers on file, a notice to plaintiff’s attorneys, containing information that a certiorari had been allowed-and issued, was acknowledged by the defendant’s attorneys. The facts, as given above, furnish no reason, in the opinion of the court, either for striking the cause from the docket of the county, or continuing it to the next term, as we have no law requiring a writ to be issued, or service to be made ten days before the term.
The only question necessarily raised upon this record, concerns the power of revocation by the parties who have entered into arbitration bonds. The commissioners claimed the right to revoke the submission, and took such measures as 'they deemed appropriate for the exercise of that right. Whether the revocation was effectual, to put an end to the power of the arbitrators, and render their award a nullity, is now to be decided.
The board of arbitrators named in the submission, consisted of seven members. They entered upon the performance of the duty assigned them, on the first day of November, and were engaged in the case, hearing the testimony of witnesses and the arguments of counsel, until the nineteenth of the *277 same month, at which time they proceeded to deliberate upqn the matters submitted to them, to determine upon the various claims of the parties, and to prepare for making up their final award. This service required a good deal of time and patient investigation. The board kept a journal of their proceedings and recorded, when it was demanded, the votes of the members, upon every proposition submitted, as they continued, from day to day, to discuss and vote upon the several items in the plaintiff’s account.
On the 23d of the month, while they were still engaged in the business submitted to them, the commissioners met, as Mills, the auditor, testifies, and between two and three o’clock P. M., made an order, under their hands and seals, that the power and authority -which had been before given to the arbitrators, be revoked, that the submission be annulled, and that notice be served upon the arbitrators to proceed no further to award upon the said differences. A form of the notice was drawn up at the same time, and signed by the commissioners. The witness does not know that he remembers why the revocation was not served on the day it was executed; if his memory serves, it was for the purpose of letting the arbitrators progress a little further with their work, thinking they were not near the end of it. Eor similar reasons, it was not served on the 24th. He does not know that other arbitrators, except Green and Grimes, were informed that revocation had been determined on. We always, he says, understood from Green and Grimes, what progress the arbitrators were making. This -witness was employed to serve the revocation upon the arbitrators, but he received no instructions from the comissioners as to how or when it was to be served. He was to receive instructions from their counsel. They wanted it drawn up and kept ready to serve, if prudent to do so. Green and Grimes conversed with witness on the morning of the 26th; they had been told by the witness, before the arbitrators met, that counsel had decided on revocation. Green wanted an organization of the arbitrators, and all to be there, when he was to inform the witness, *278 who was to make his appearance, and read the revocation. The witness served the revocation upon the arbitrators between nine and ten o’clock A. M. The foregoing facts are collected from the various parts of the testimony of Mills, as given before the court of common pleas. Mitchell, one of the arbitrators, testifies that the journal contains an account of what occurred after the testimony and arguments of counsel were heard, till the board finally adjourned. He says it was intended at the time, to make the journal of the 26th particularly accurate, as the revocation was presented on that day. He says — " for the last three or four days of our deliberations, a majority of us came to the conclusion, that we never could be unanimous, and that we had sufficiently borne with each other.”
It appears evident enough, from, the testimony given in the case, that all the arbitrators, on the 26th of the month,'were looking for a revocation of their authority, to be presented sometime on that day; and further, that it was the intention of a majority of them, to determine upon an award, before it should be presented. Green and Grimes withdrew, after the revocation was read, but the other five arbitrators remained together, and on the same day made and signed the final award in the case.
It appears from what is above stated, that though the labors of the arbitrators were brought nearly to a close, their award was not actually made out, until the paper, designed to put an end to their authority, was handed in to them; so that the question may be regarded as sufficiently before us, whether these commissioners had the right to revoke the submission, if it was done before the award was drawn and executed.
This question is a new one, coming now for the first time to be considered and ■ decided by this court. It must be observed that it arises upon the statute authorizing and regulating arbitrations, which has furnished to these parties a guide for every step in the proceeding, and • must furnish to this court the law of the case, wherever its provisions are *279 applicable. This statute provides for submitting all controversies, except when the possession or title to real estate may come in question, to any person or persons mutually agreed upon by the parties, and for making such submission a rule of any court of record in the state.
The parties may enter into bonds, conditioned for the faithful performance of the award, setting forth the names of the arbitrators and the matters submitted; and when such is the agreement, that the submission be made a rule of court. The bonds must specify time and place for holding the arbitration, allowing the arbitrators liberty to adjourn from time to time, until an award be made, some certain time being specified in the bond for making the award.
The statute provides that the parties shall have the benefit of legal process to compel the attendance of witnesses; that the person disobeying such process, shall be deemed guilty of contempt of the court from which the process issued, and subject to the penalties inflicted upon persons disobeying writs of subpoena in other cases.
The arbitrators, and all witnesses, shall be under oath, to be administered by any judge or justice of the peace of the proper county.
That the award shall be drawn up in writing, and signed by the arbitrators, or a majority of them, and a true copy, without delay, be delivered to each of the parties.
That if either party refuse or neglect to comply with the award, the other party may file the same, together with the submission or arbitration bond, in the court named in the submission, or if no court be named, then in the court of common pleas in the county where the arbitration was held.
That such court, at its next term, if no legal exceptions be taken to the award or other proceedings, and the award is for the payment of money, shall enter up judgment thereon, as on a verdict of a jury, and issue execution, as in other cases.
*280 That so far as the award directs the performance of any thing, other than the payment of money, the party disobeying, shall be liable to be punished as for a contempt of court, either by attachment, sequestration, or execution.
That if any legal defects appear in the award, or other proceedings, or it shall be made to appear, on oath, that the award was obtained by fraud, corruption, or other undue means, or that the arbitrators misbehaved, the court may set aside the award.
Further, the statute fixes the sum to 'which each arbitrator shall be entitled for his services, and the fees of witnesses, and. of the judge or justice for administering- oaths, directing them to be taxed by the arbitrators and inserted in their award.
This is certainly very minute and comprehensive legisla tion, designed and calculated effectually to guard, as well as to enforce, the several rights of the parties interested. The provisions of this law demand a liberal interpretation from courts, for the purpose of advancing the object and extending the remedies "contemplated by its passage. It is obvious, from looking at this law, that it is capable of becoming extensively useful in its operation. It settles controversies speedily, by men against whom neither parties would object, and generally at the place where the parties and their witnesses reside. It may often be appealed to advantageously, for the settlement of important difficulties, because it affords to parties the privilege of selecting for their triers, men of superior and known intelligence and integrity. This law embraces within its scope, every subject of dispute, except it be the possession and title of real estate; comprehending all cases in equity and at law, whether sounding in tort or contract, and allowing parties to settle one or several and complicated matters of differ ence, by a single arbitration. As the board of arbitrators created by it may try and determine questions so various in their character, so they may take jurisdiction over the largest interests, and of sums unlimited in amount.
*281 When the legislature enacted this law upon the subject of arbitrations, gave powers so ample, and at the same time guarded them so carefully, they never could have meant to allow an interference like this right of revocation. They could not have intended that the arbitrators should be sworn-to the faithful performance of their duty, should proceed, by the examination of witnesses and otherwise, throughout the hearing of the case, and at last, when about to make up their award, be exposed, at the mere will of one of the parties, to be suddenly deprived of their authority. The common law right of revocation, had it been introduced here, and acted upon, before the enactment of such a law as the present, might well enough be deemed, after its passage, to have been abrogated by it, or left to operate alone upon common .law arbitrations.
In Pollock v. Hall, 4 Dall. 222, the court would not permit a party to defeat a rule of reference, by discontinuing the cause, and they use, in that case, the following language: " The record of cases does not show any judicial decision of ours; therefore, we think we are at liberty to deny the right for which the plaintiff contends, and the policy of the legislature, as well as the principles of justice, will sustain the denial.”
Since by no decision of this court, has the principle of revocation been applied to the proceedings of arbitrators under our statutes, and no settled or uniform course of practice appears to have prevailed over the state, there exists no precedent or usage to control the decision of this case.
In Lindsley v. Coates, 1 Ohio Rep. 245, the court say, respecting the common law: " It has been repeatedly determined by the courts of this state, that they will adopt its principles as rules of decision, so far only as those principles are-adapted to our circumstances, state of society, and form of government.”
Pursuing the spirit of that decision, and with our view of the whole subject, we would not adopt the common law *282 principle of revocation, and allow it to operate upon arbitrations conducted under our statute.
But if the general right of revocation were to be acknowl edged, it might still be questionable, looking at all the facts and circumstances disclosed, whether it should be decided that the defendants had, in this case, accomplished the revocation which they designed.
We hold, that the right to revoke the submission, did not exist at the time when the attempt was made to exercise it.
And we hold further, that no such right exists at any time after the arbitrators are sworn.

The judgment of the Common Pleas is reversed.